| |
|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY<br>**Caption in Compliance with D.N.J. LBR 9004-1(b)**<br><br>Maha M. Kabbash, Esq. (MK-0163)<br>Diana Katz Gerstel, Esq. (DG-6038)<br>Cheska Tolentino, Esq. (CT-4204)<br>**TUCKER ELLIS LLP**<br>1776 On the Green<br>67 E. Park Place, Ste. 900<br>Morristown, NJ 07960<br><br>&<br><br>Thomas R. Fawkes (*Pro Hac Vice*)<br>Jason J. Ben (*Pro Hac Vice*)<br>**TUCKER ELLIS LLP**<br>233 South Wacker Dr., Suite 6950<br>Chicago, IL 60606<br><br>*Counsel for the PDI Group and PDI Ground Support Systems Inc.* |
| In re:<br><br>COLINEAR MACHINE & DESIGN HOLDINGS LLC,<br><br>*Debtor*. |

Chapter 11

Case No. 25-10813 (VFP)

**Hearing: October 7, 2025 at**

**MEMORANDUM OF LAW BY THE PDI GROUP AND PDI GROUND SUPPORT SYSTEMS INC. IN OPPOSITION TO DEBTOR'S MOTION TO COMPEL PDI GROUP, OR ITS DESIGNEE, TO TENDER PAYMENT TO THE DEBTOR PURSUANT TO ASSET PURCHASE AGREEMENT TO <u>FUND THE PLAN OF ORDERLY LIQUIDATION</u>**

The PDI Group and PDI Ground Support Systems Inc. (collectively, "PDI"), by and through their counsel, Tucker Ellis LLP, files this objection (the "Objection") to the *Debtor's Motion to Compel PDI Group, or its Designee, to Tender Payment to the Debtor Pursuant to Asset Purchase Agreement to Fund the Plan of Orderly Liquidation* (ECF No. 152-1, the "Motion"). In support of the Objection, PDI respectfully states as follows:

1

7077632.1

**Preliminary Statement**

Having already been rebuffed on its first attempt to plug its self-inflicted administrative solvency hole through an ill-fated and wholly unsupported motion to surcharge PDI's collateral, the Debtor's second bite at the apple is the instant Motion, pursuant to which it seeks to "compel" PDI to honor payment obligations under the parties' Asset Purchase Agreement that PDI long ago honored. For the reasons set forth in this Objection, the Debtor's Motion – supported by a certification riddled with factual errors and inflammatory allegations – must be denied.

PDI reiterates that it has fully complied with each and every contractual and legal obligation it made to the Debtor and this Court in this case, often exceeding those obligations because it knew if it did not do so, the Debtor was doomed to fail. But these acts are completely ignored by the Debtor, who would have this Court believe that PDI is guilty of numerous broken promises and misrepresentations. These allegations strain credulity and frankly, are offensive to PDI, who has always conducted itself with integrity (as recognized by this Court).

Of course, PDI takes no pleasure in seeing estate professionals left unpaid. It funded the entire professional budget requested by the Debtor in the DIP budget, and in fact, has even offered to put additional money into the estate to cover a portion of the Debtor's administrative gap, contingent upon matching funds from the Debtor's principals – who are ultimately responsible for the position the Debtor is currently in. The Debtor's principals refused this reasonable request, instead electing to foist this burden on PDI under wholly frivolous legal theories. This Court should no longer sanction this conduct, and should determine that PDI's obligations to this estate are fully discharged. The Motion should be denied in its entirety.

7077632.1

**Factual Background**

On January 27, 2025 (the "Petition Date"), the Debtor filed a voluntary petition for relief (the "Petition") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey. [ECF 1]. The Debtor continues to manage its affairs as a debtor-in-possession pursuant to Bankruptcy Code §§1107(a) and 1108.

As this Court is aware, PDI was the debtor-in-possession lender to the Debtor, and the purchaser of substantially all of the Debtor's assets pursuant to a Court-approved sale process and agreements that were heavily negotiated with the Debtor and its experienced bankruptcy counsel. Specifically, PDI and the Debtor negotiated, and had approved by this Court, two documents that set forth *in their entirety* PDI's funding obligations: (i) that certain $1,000,000.00 Senior Secured Super-Priority Debtor in Possession Loan and Security Agreement, Summary of Proposed Material Terms and Conditions (ECF No. 15-2, Exhibit B (the "DIP Agreement"), and (ii) that certain Asset Purchase Agreement by and between the Debtor and PDI, or its designee, dated January 30, 2025 (ECF No. 15-2, Exhibit A, the "APA").

There is absolutely no doubt that PDI has discharged, in its entirety, each and every one of its obligations under both the DIP Agreement and the APA – and in fact, *exceeded* those obligations when it became necessary, whether due to the Debtor's failure to honor its own obligations or due to misrepresentations concerning other sources of post-petition working capital. At the risk of repeating what has already been stated by PDI in prior pleadings with this Court, PDI reiterates: (i) PDI overadvanced on the DIP loan, ultimately funding $950,000 when it was only required to advance $825,000 based on the approved DIP Budget; (ii) PDI agreed to provide an increased initial advance on the DIP Loan – at the request of the Debtor – to fund missed payroll during the week prior to the commencement of the bankruptcy; (iii) PDI agreed to pay a portion

3

of the *personal* American Express credit card of Mark Heston in order to secure his continued involvement with the Debtor through closing of the sale; and (iv) PDI incurred obligations that were the express obligations of the Debtor under the APA; namely, satisfying the Debtor's obligations under section 5.8 of the APA to comply with the Industrial Site Recovery Act, N.J.S.A. 13:1K and N.J.A.C. 7:26B and the regulations adopted thereunder ("ISRA Requirements"), including the requirements for remediation of the Leased Real Property in accordance with N.J.A.C. 7:26B-3.3. PDI performed those obligations, despite having no contractual requirement to do so, because the Debtor could not.[1]

As for the APA – the subject of the Debtor's latest salvo to patch its self-created administrative insolvency hole at PDI's expense – PDI takes umbrage with the Motion and particularly, Ms. Placona's Certification, which wholly misconstrues the nature of the parties' agreements. PDI wishes to set the record straight, once and for all, so that it is not required to continue to expend substantial legal expense fighting against the Debtor's increasingly frivolous pleadings.

First, we address Mr. Placona's assertion that "[t]he Debtor has detrimentally relied on PDI's promise to pay to fund a plan; otherwise, the Debtor may not have accepted PDI as a buyer." This assertion is rather interesting, in that it would lead this Court to believe that the Debtor had options other than PDI to fund the bankruptcy and purchase the assets. It did not. The Debtor knows this and yet made the argument anyway. The truth is, PDI was the *only* party that was willing to provide debtor-in-possession financing, that was willing to purchase the Debtor's assets and preserve its business, and that was willing to close those transactions on an expedited basis.

---

[1] It also bears repeating that PDI undertook primary drafting responsibility – at its own expense – for: (i) the DIP Agreement; (ii) the APA; (iii) both the interim and final DIP orders; and (iv) the Sale Order. It undertook primary responsibility for negotiating and documenting the assumption and assignment of each of the equipment loans and leases and the real property leases, as well.

4

Neither the Debtor nor its counsel can reasonably dispute that if the Debtor did not "accept" PDI as a buyer, its closure and liquidation would have been assured.

In any event, Ms. Placona does not cite to a shred of evidence that PDI "promise[d] to pay to fund a plan," because PDI made no such promise. PDI's "promises" are exactly as set forth in the DIP Agreement and the APA, and nothing more.

Ms. Placona next asserts that PDI has failed to remit payment of the $150,000 cash consideration required under the APA, that the Debtor's efforts to collect these amounts were not responded to, and that the Debtor therefore had no choice but to bring its Motion. Ms. Placona is plainly mistaken.

As Ms. Placona and her client are most certainly aware, as the parties approached closing of the sale transaction, a significant issue arose: because the Debtor failed to meet its obligations under section 5.8 of the APA and the related ISRA Obligations, PDI was required to step in and retain a consultant to perform a Preliminary Assessment – with respect to both of the properties the Debtor leased – in accordance with ISRA. Because this Preliminary Assessment could not be completed quickly enough to meet the parties' anticipated closing date, PDI was required to put up $200,000 in financial assurances ($100,000 for each property) with the New Jersey Department of Environmental Protection (NJDEP) pending the completion of the Preliminary Assessment process, which would permit closing to proceed as scheduled.

PDI undertook the entire process – at its own expense – of retaining the environmental consultant and performing the legal work necessary to keep the parties on their closing schedule, despite the fact that all of these obligations were to have borne by the Debtor. In consideration of the unforeseen additional burden placed on PDI, PDI proposed that it be permitted to use $100,000 of the $150,000 required cash consideration under the APA for a portion of the financial assurance,

with the acknowledgment that such funds would be turned over to the estate as soon as the Preliminary Assessment process was completed. *The Debtor – through its counsel (Ms. Placona) – agreed to this proposal. The financial assurance funds are being held in McManimon, Scotland & Baumann's trust account, and Ms. Placona knows this.*

As for the other $50,000 of the required cash contribution under the APA, PDI paid these amounts to the Debtor at closing (less $9,442.71, representing interest owed by the Debtor to PDI under the DIP Agreement). The Debtor – and Ms. Placona – are undoubtedly aware of this, as such transfer appears in the Debtor's Monthly Operating Report for April 2025 (Docket No. 130, pg. 23).

As a matter of full candor, however, PDI notes that Ms. Placona's recitation of the relevant obligations of PDI is both erroneous and incomplete. Again, to ensure the accuracy of the record, PDI refers the Court to its order approving the APA, which effectuated a modification of section 2.5 of the APA (setting forth the purchase price for the Debtor's assets) as follows:

> On the terms and subject to the conditions hereof, at the Closing, the aggregate consideration for the Purchased Assets shall consist of: (i) a credit bid under and in accordance with Section 363(k) of the Bankruptcy Code (the "Credit Bid") of all DIP Obligations of Seller pursuant to that certain $1,000,000 Senior Secured Superpriority Debtor-in-Possession Loan and Security Agreement (the "DIP Loan"); (ii) the value attributed to the assumption of the Assumed Liabilities; (iii) a Cash amount equal to ten percent (10%) of the allowed general unsecured claims of Seller, which shall be determined, in part, by Schedule E/F of the Debtor's Schedules of Assets and Liabilities (**less any payments made by the Debtor to critical vendors**).

Docket No. 42, ¶ 8 (emphasis added).

The Debtor scheduled general unsecured claims in the aggregate amount of $2,612,196.73 in its Schedules of Assets and Liabilities. Docket No. 85.

Substantial critical vendor payments were made by the Debtor – with the consent of PDI and using the proceeds of PDI's debtor-in-possession loan – to ensure that the business would be

6

7077632.1

able to operate through the closing of the sale. These payments are evidenced by Debtor's monthly operating report for February 2025 (Docket No. 121), which was signed by Ms. Placona and the Debtor's Chief Executive Officer, Dod Wales, under penalty of perjury. In the February MOR, the Debtor represents that it made pre-petition critical vendor payments in the amount of $125,522.49. These payments therefore constitute a reduction from the required cash contribution of PDI at the closing of the sale to **$135,697.19**.

In this respect, PDI has fully discharged – if not *exceeded* – its obligations under the APA. At closing, PDI tendered to the Debtor $100,000 of the cash consideration pursuant by way of the NJDEP financial assurance escrow, which is being held by the Debtor's counsel and will be released to the estate immediately upon completion of the Preliminary Assessment; and tendered the remaining cash consideration directly to the Debtor, less DIP interest due. The Debtor *knows* this, making the filing of the Motion that much more confounding.

PDI cannot emphasize more strenuously that there is absolutely no basis in law or in fact for the relief requested by the Debtor.

## **CONCLUSION**

For the foregoing reasons, PDI respectfully requests that this Court deny the Motion in its entirety.

7077632.1

Respectfully submitted,

Dated: September 30, 2025

By:    /s/ *Diana Katz Gerstel*

Diana Katz Gerstel
DNJ Bar # DG6038
TUCKER ELLIS LLP
67 East Park Place, Suite 900
Morristown, NJ 07960
Telephone: 862-261-2533
Email: diana.gerstel@tuckerellis.com

and

Thomas R. Fawkes (*pro hac vice*)
Jason J. Ben (*pro hac vice*)
TUCKER ELLIS LLP
233 S. Wacker Dr., Suite 6950
Chicago, IL 60606
Telephone: 312-624-6300
Email: thomas.fawkes@tuckerellis.com
       jason.ben@tuckerellis.com

*Counsel to the PDI Group and PDI Ground Support Systems, Inc.*

7077632.1